**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **1. AMBER CASKEY,**<br>**an individual,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**1. SOUTHWEST AIRLINES CO.,**<br>**a Texas Corporation,**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. ________** |

**<u>COMPLAINT</u>**

Plaintiff, Amber Caskey, for her claims against Defendant, Southwest Airlines Co., alleges and states as follows:

## I. PARTIES

1. Plaintiff Amber Caskey is an individual and a resident of Oklahoma County, State of Oklahoma.

2. Defendant Southwest Airlines Co. is a corporation organized and existing under the laws of the State of Texas, with its principal place of business located at 2702 Love Field Drive, Dallas, Texas 75235.

3. At all times relevant to this Complaint, Defendant employed more than 15 employees and was an employer within the meaning of the Americans with Disabilities Act and the Oklahoma Anti-Discrimination Act.

## II. JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331, which grants the district courts original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States, and pursuant to 28 U.S.C. § 1343, which grants the district courts original jurisdiction of any civil action authorized by law to be commenced by any person to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights.

5. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

6. Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission on or about December 15, 2025, bearing Charge No. 564-2026-00634.

7. Plaintiff received a Notice of Right to Sue from the Equal Employment Opportunity Commission on or about June 24, 2026, and this Complaint is filed within 90 days of receipt of that Notice.

8. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant conducts business in this district and a substantial part of the events or omissions giving rise to the claims occurred in this district.

## III. FACTUAL ALLEGATIONS

### Background and Employment History

9. Plaintiff was employed by Defendant Southwest Airlines for nearly 14 years, beginning in June 2011.

10. Plaintiff worked in Customer Service for approximately 10 years and in Customer and Baggage Services for approximately 3 years before that department was dismantled in 2024.

11. Plaintiff has Cerebral Palsy, a physical disability that substantially limits one or more of her major life activities, including walking, standing, and performing manual tasks.

12. Plaintiff's Cerebral Palsy specifically affects the motor functions of the right side of her body and impacts the motor functions of her right hand.

13. Consequently, Plaintiff can type using only one hand in a non-traditional format.

14. Plaintiff also has dyslexia, which was diagnosed during her childhood as part of speech therapy provided by her school.

15. Later in life, Plaintiff was diagnosed with Attention-Deficit/Hyperactivity Disorder ("ADHD") on or about April 10, 2025.

16. At the time of her ADHD diagnosis, Plaintiff learned that her ADHD affected her ability to distinguish between certain characters when she was performing certain tasks.

17. ADHD is a mental impairment that substantially limits one or more of Plaintiff's major life activities, including concentrating, thinking, and learning.

**Department Dissolution and Reassignment**

18. In or about June 2024, Plaintiff learned that her department, Customer and Baggage Services, was being dissolved.

19. Plaintiff was given three options: accept a voluntary separation package, relocate to Dallas for an in-person role, or be placed at a local station if available.

20. Due to her Cerebral Palsy, working in a physically demanding role was not feasible for Plaintiff.

21. Plaintiff submitted a formal accommodation request supported by her physician, documenting restrictions that she was unable to stand for long periods, walk more than 20 meters, or lift over 10 pounds.

22. On or about October 15, 2024, Customer and Baggage Services was officially dissolved.

23. In November 2024, Plaintiff was assigned to the role of Senior Ground Operations Timekeeping Associate by HR representative Sheli Brown and senior director Laura Adams.

24. The Senior Ground Operations Timekeeping Associate position required processing timecards to ensure the accuracy of payroll records for serviced employees.

25. Despite knowing of Plaintiff's Cerebral Palsy, Defendant never inquired whether Plaintiff's disability would affect her ability to do the Timekeeping Associate position and failed to perform any assessment about Plaintiff's ability to perform this position.

26. The position required applying knowledge of Collective Bargaining Agreements and employee guidelines, updating affected systems accurately and timely, researching and correcting inaccurate or missing time off and punches/hours worked, and meeting productivity and accuracy standards to support team goals and meet daily deadlines.

27. The position further required intermediate-level experience in timekeeping and Collective Bargaining Agreements, time management and attention to detail, and the ability to concentrate on multiple tasks over a period without being distracted and to focus on repetitive tasks while ensuring high attention to detail.

28. The position's physical abilities requirements included the ability to use a computer and other office productivity tools with sufficient speed and accuracy to meet the demands of the job.

29. Plaintiff started training for the Timekeeping role on or about November 11, 2024.

30. From the start, Plaintiff encountered difficulties with the technical demands of the job, especially in typing and transferring data from station documents into the payroll system, due to her Cerebral Palsy.

31. The job required Plaintiff to constantly switch between the mouse and the keyboard one-handed, forcing her to type in a way she had not been trained to do.

32. Plaintiff consistently asked for assistance and clarification on job tasks throughout her time in the new role.

33. Plaintiff repeatedly informed leadership that she felt she lacked a foundational understanding of key workflows and systems.

34. Plaintiff was often told that the work would eventually "click," but this reassurance was not accompanied by meaningful support or training.

**Disclosure of Disabilities and Requests for Accommodation**

35. On or about January 6, 2025, Plaintiff disclosed to her department that she had dyslexia.

36. During the January 6th conversation regarding her dyslexia, Plaintiff explained that she sometimes mixes up or transposes letters and used an example involving the airport codes for St. Louis (STL) and Salt Lake City (SLC) as an example.

37. Plaintiff was asked if she needed an accommodation for dyslexia and recalls that she responded that she did not know what kind of accommodation would be available.

38. Plaintiff's leader contacted the Accommodations Team to engage with Plaintiff and inquire if she needed any accommodations to perform the essential functions of her role.

39. In February 2025, Defendant's Accommodations Team sent Plaintiff a blank Confidential Medical Information Form as part of paperwork for an Accommodation Request but provided no explanation regarding why the form had been sent.

40. The Accommodations Team followed up with Plaintiff on March 6 and 13, 2025.

41. Defendant never explained to Plaintiff that the Accommodation Request related to Plaintiff's disclosure of her dyslexia.

42. Because Plaintiff did not understand the purpose of the email containing the Accommodation Request, she did not respond or complete the form at that time.

43. In mid-April, 2025, Plaintiff disclosed to leadership that she was working with her physician to manage her disability and that she had recently been diagnosed with ADHD, which affected her ability to adapt quickly to complex systems.

44. Plaintiff also disclosed that she typed one-handed, which directly impacted the speed and accuracy of completing typing-intensive tasks.

45. On or about May 12, 2025, Plaintiff submitted a formal written request for workplace accommodations to help support her ability to perform her role effectively.

46. In her accommodation request, Plaintiff stated that she had recently been diagnosed with ADHD and was navigating a physical condition that required her to type using one hand in a non-traditional format.

47. Plaintiff requested the following accommodations: additional time for tasks that involve sustained concentration and require extensive manual input, including non-standard one-handed typing; access to periodic coaching or check-ins to support prioritization and organization; and targeted training or refreshers to reinforce workflows and task-related procedures.

48. Plaintiff explained that inputting information from the station into the pay program was difficult to complete efficiently due to the manual demands of one-handed typing and the complexity of the entries, and that

managing the three (sometimes four) different sets of contract rules required sustained mental organization, which ADHD impacts.

49. Plaintiff stated that with additional time, targeted coaching, and ongoing training, she could be more effective and consistent in performing her duties.

50. Plaintiff indicated that her doctor would be providing formal documentation to support her request.

## Performance Issues and Disciplinary Actions

51. On March 7, 2025, Plaintiff was issued a Letter of Expectations that discussed the coaching Plaintiff had received and outlined the areas of improvement needed to be successful.

52. The Letter of Expectations was issued despite Plaintiff's repeated requests for support and clarification of what she was doing incorrectly.

53. Plaintiff was placed on a Performance Improvement Plan ("PIP") on March 26, 2025.

54. The PIP required Plaintiff to process 200 timecards in week one, 250 timecards in week two, 300 timecards in week three, and 350 timecards in week four, while showing immediate progress in accuracy and maintaining continued progress with a sustained downward error trend.

55. Despite Plaintiff's failure to meet the metrics, her performance, accuracy, and speed improved over the PIP's four weeks, and Defendant extended the Performance Improvement Plan for one additional week.

56. On or about March 19–22, 2025, after Plaintiff's repeated requests, Plaintiff's leads (Jan and Deanna) observed Plaintiff's work.

57. Lead Jan stated that she could not find anything wrong with the way Plaintiff was processing time.

58. The following day, lead Deanna identified several key workflow errors: incorrect math calculations, incorrect verification of agent schedules, and misinterpretation of lunch rules.

59. After implementing the corrections identified by lead Deanna, Plaintiff showed immediate improvement and began completing some days successfully.

60. Plaintiff's performance improved significantly during weeks three and four of the Performance Improvement Plan.

61. For the fifth week of the Performance Improvement Plan, Plaintiff was assigned the New Orleans and San Antonio stations, which are known to be extremely difficult stations even for seasoned Timekeepers.

62. Multiple experienced timekeepers advised that these assignments appeared to be setting Plaintiff up to fail.

63. Plaintiff was explicitly told not to speak with other timekeepers, which contributed to her isolation and stress.

64. Despite being told not to speak with other timekeepers, four timekeepers reached out to help Plaintiff; three were strangers, and one knew of Plaintiff through a mutual friend.

65. These timekeepers explained rules, offered tips, and helped Plaintiff understand the workflow.

66. Most of their assistance came late in the process, when it was difficult for Plaintiff to demonstrate lasting improvement.

**Denial of Accommodation and Termination**

67. On or about May 14, 2025, HR representative Sheli Brown and management informed Plaintiff that she was being terminated effective immediately.

68. Plaintiff told HR representative Sheli Brown and management that she had previously submitted an accommodation request and that her doctor was working on his portion.

69. HR representative Sheli Brown told Plaintiff that accommodations cannot be requested once a Performance Improvement Plan is in place.

70. Notwithstanding Defendant's representations to Plaintiff, there is no defense or policy that precludes or excuses an employer's legal obligations

to consider a reasonable accommodation request solely because an employee is subject to a Performance Improvement Plan.

71. Defendant refused to even consider an accommodation for Plaintiff's ADHD, stating that because she was on a Performance Improvement Plan, Defendant was under no obligation to attempt to accommodate her disability.

72. The termination letter stated that Plaintiff was unable to meet her productivity goals or meet pay error and attendance error standards.

73. Had Plaintiff's requested accommodations been granted, she could have performed the essential functions of her position as Timekeeper.

74. At the time of her termination, Plaintiff had not yet received any accommodations from Defendant for her Cerebral Palsy, dyslexia, or ADHD.

## Emotional and Economic Harm

75. Plaintiff reported emotional distress, skipped lunches and breaks, and was under high stress trying to meet Defendant's expectations.

76. On or about February 23, 2025, Plaintiff contacted Southwest's Clear Skies mental health program due to emotional distress.

77. Plaintiff was emotionally overwhelmed, isolated, and often cried during work time and doctor visits.

78. This employment action has affected Plaintiff's emotional health, causing distress, anxiety, fear, and depression.

79. Plaintiff has suffered economic losses, including lost wages, benefits, stock options, and other compensation.

## COUNT I — DISABILITY DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

80. Plaintiff incorporates by reference paragraphs 1 through 79 as if fully set forth herein.

81. The Americans with Disabilities Act prohibits covered entities from discriminating against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment 42 U.S.C. § 12112.

82. Plaintiff is an individual with a disability within the meaning of the Americans with Disabilities Act because she has physical and mental impairments—Cerebral Palsy, dyslexia, and ADHD—that substantially limit one or more of her major life activities, including walking, standing, performing manual tasks, concentrating, thinking, and learning.

83. Plaintiff is a qualified individual within the meaning of the Americans with Disabilities Act because, with reasonable accommodation, she

could perform the essential functions of the Senior Ground Operations Timekeeping Associate position.

84. Defendant discriminated against Plaintiff based on her disabilities by terminating her employment because of her Cerebral Palsy, dyslexia, and ADHD.

85. Defendant's termination of Plaintiff's employment constitutes unlawful discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112(a).

**COUNT II — FAILURE TO PROVIDE REASONABLE ACCOMMODATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT**

86. Plaintiff incorporates by reference paragraphs 1 through 85 as if fully set forth herein.

87. The term "discriminate against a qualified individual on the basis of disability" includes not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity 42 U.S.C. § 12112.

88. The term "reasonable accommodation" may include job restructuring, part-time or modified work schedules, reassignment to a vacant

position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities, *see* 42 U.S.C. § 12111.

89. Plaintiff timely requested reasonable accommodations for her disabilities, including additional time for tasks that involve sustained concentration and require extensive manual input, access to periodic coaching or check-ins to support prioritization and organization, and targeted training or refreshers to reinforce workflows and task-related procedures.

90. Defendant failed to provide any of the reasonable accommodations Plaintiff requested.

91. Defendant refused to even consider Plaintiff's accommodation request, stating that because she was on a Performance Improvement Plan, Defendant was under no obligation to attempt to accommodate her disability.

92. The accommodations Plaintiff requested would not have imposed an undue hardship on Defendant's business operations.

93. Additionally, Defendant's failure to consider Plaintiff's accommodation requests demonstrates that Defendant did not even consider whether there would be an undue hardship on its business operations.

94. With the requested reasonable accommodations, Plaintiff could have performed the essential functions of the Senior Ground Operations Timekeeping Associate position.

95. Defendant's failure to consider or provide reasonable accommodations to Plaintiff constitutes unlawful discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112(b)(5)(A).

## COUNT III — RETALIATION AND INTERFERENCE IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

96. Plaintiff incorporates by reference paragraphs 1 through 95 as if fully set forth herein.

97. Plaintiff engaged in protected activity under the Americans with Disabilities Act by disclosing her disabilities to Defendant and requesting reasonable accommodations for those disabilities months before her employment was terminated.

98. Defendant was aware of Plaintiff's protected activity.

99. Although Plaintiff had disclosed her recent diagnosis of ADHD, Defendant nonetheless terminated Plaintiff's employment after Plaintiff disclosed her diagnosis and requested accommodations for her ADHD and Cerebral Palsy.

100. Defendant's termination of Plaintiff's employment was causally connected to Plaintiff's protected activity of requesting a reasonable accommodation.

101. Defendant's conduct in terminating Plaintiff in response to her accommodation requests interfered with Plaintiff's rights under the Americans with Disabilities Act and constitutes unlawful retaliation.

102. Defendant's retaliation and interference constitute unlawful discrimination in violation of the Americans with Disabilities Act, 42 U.S.C. § 12112 and 42 U.S.C. § 12203.

**COUNT IV — DISABILITY DISCRIMINATION IN VIOLATION OF THE OKLAHOMA ANTI-DISCRIMINATION ACT**

103. Plaintiff incorporates by reference paragraphs 1 through 102 as if fully set forth herein.

104. The Oklahoma Anti-Discrimination Act prohibits employers from discriminating against individuals on the basis of disability.

105. Plaintiff is an individual with a disability within the meaning of the Oklahoma Anti-Discrimination Act.

106. Defendant is an employer within the meaning of the Oklahoma Anti-Discrimination Act.

107. Defendant discriminated against Plaintiff based on her disabilities by terminating her employment because of her Cerebral Palsy, dyslexia, and ADHD.

108. Defendant failed to provide reasonable accommodations to Plaintiff for her known disabilities.

109. Defendant's conduct constitutes unlawful disability discrimination in violation of the Oklahoma Anti-Discrimination Act, 25 O.S. § 1101 et seq.

## IV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendant as follows:

A. A declaratory judgment that Defendant violated the Americans with Disabilities Act and the Oklahoma Anti-Discrimination Act;

B. An order reinstating Plaintiff to her former position or to a comparable position for which she is qualified;

C. An award of back pay from the date of termination to the date of reinstatement or judgment, less interim earnings, with prejudgment interest as allowed by law;

D. An award of front pay in lieu of reinstatement if reinstatement is not feasible;

E. An award of compensatory damages for Plaintiff's emotional distress, pain, suffering, and other pecuniary losses;

F. An award of punitive damages;

G. An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 12117(a) and 42 U.S.C. § 2000e-5(k);

H. Such other and further relief as the Court deems just and proper.

## V. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Ronald T. Shinn Jr.*
Ronald T. Shinn Jr., OBA #19569
HB Law Partners, PLLC
PO Box 668
Norman, OK 73070
(405) 561-2410
(405) 563-9085 (fax)
Ron@hblawpartners.com

***Attorney for Plaintiff***